**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 96-4675

MELVIN E. HOWARD, a/k/a Mu,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 96-4676

GEORGE H. JONES,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 96-4677

JIMMY BACON,
Defendant-Appellant.

Appeals from the United States District Court

for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(CR-95-123)

Argued: May 7, 1997

Decided: June 13, 1997

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge, and COPENHAVER, United States District Judge for the Southern District of West Virginia, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Michael and Judge Copenhaver joined.

_____

**COUNSEL**

**ARGUED:** Michael R. Ramos, RAMOS & LEWIS, Shallotte, North Carolina, for Appellant Howard; Vaughan S. Winborne, Jr., Raleigh, North Carolina, for Appellant Jones; Edwin Mitchell Hardy, Washington, North Carolina, for Appellant Bacon. Anne Margaret Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, William W. Webb, Assistant United States Attorney, Amanda L. Eller, Third Year Law Student, Duke University, Raleigh, North Carolina, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

Melvin Howard, George Jones, and Jimmy Bacon were convicted in May 1996 of conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846. Howard, Jones, and Bacon appeal their convictions on several grounds -- that Howard's confession should not have been admitted, that Howard's counsel should not have been disqualified, that the judge made prejudicial comments at trial, that a co-conspirator's statement should have been excluded, that the jury should have been given instructions regarding multiple conspiracies, that the government presented insufficient evidence to support Howard and Bacon's convictions, and that Jones' sentence was improperly enhanced. Finding the defendants' contentions to be without merit, we affirm the judgment of the district court.

2

I.

Howard, Jones, and Bacon were part of a large cocaine distribution network in and around Raleigh, North Carolina for some time prior to their arrest in 1995. Several of the co-conspirators regularly transported cocaine from Florida, and members of the conspiracy used houses and hotels in the Raleigh area for the sale of the drugs.

On May 18, 1995, Howard flew to Florida for the purpose of surrendering to his probation officer for a violation of the terms of his probation. At the airport, Howard was approached by Agent Jimmy Waddell and two other agents of the Drug Enforcement Administration (DEA), who wanted to question him about suspected drug activities. The agents drove Howard to the state probation office, where he had an appointment with his probation officer. At the probation office, the agents questioned Howard. Howard revealed that he was part of an organization responsible for transporting two to three kilograms of crack cocaine from Florida to North Carolina every month. He further indicated that he would be willing to cooperate with the government but for the fact that his attorney, Louis Vernell, would inform other members of the cocaine organization of his cooperation. Portions of these statements were later admitted at trial despite Howard's efforts to have them suppressed.

Larry Davis, an organizer in the conspiracy, testified at trial that he had recruited defendants Jones and Bacon, both childhood friends from Florida, to come to North Carolina to sell drugs for him. Davis testified that Jones and Bacon were given guns to protect themselves while selling drugs. He identified the guns during trial. He further testified that he was around Jones daily, and that Jones and Bacon kept $600 to $700 per day as their take from sales of drugs. Numerous other government witnesses, many of them co-conspirators, testified to the participation of Howard, Jones, and Bacon in the drug conspiracy.

The jury found all three defendants guilty of conspiracy. Howard was sentenced to 262 months, Jones to life, and Bacon to 324 months in prison. Each sentence also provided for supervised release after prison -- five years for Howard and ten years for Jones and Bacon.

3

II. Pre-Trial Issues

A.

Howard first claims that the trial judge erred in denying Howard's motion to suppress the statements he made to DEA Agent Waddell. He argues that he was in the custody of the DEA agents at the time the statements were made and therefore should have been advised of his Miranda rights. We are mindful that while we review mixed questions of law and fact de novo, "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges." Ornelas v. United States, 116 S.Ct. 1657, 1663 (1996).

An individual is "in custody" for Miranda purposes when, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a `degree associated with formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (citation omitted). The facts in this case fail to support Howard's claim that a reasonable person in his position would have understood that he was in custody. See id. at 442. Because the district court in this case found Agent Waddell's testimony to be credible, and Howard's testimony to be "not credible," "untruthful," and "impeached," we must examine the circumstances of Howard's statement as described by Agent Waddell.

According to Waddell's testimony, three DEA agents met Howard at the airport, identified themselves, and offered him a ride to his intended destination -- the probation office. Howard accepted the offer. Agent Waddell testified that had Howard refused the ride, the agents would have left without him. The DEA agents did not brandish their weapons, nor did they step out of the car with Howard and flank him as he moved. Once at the probation office, the DEA agents interviewed Howard. He was not placed under arrest or handcuffed prior to or during the interview, nor was he restricted in his use of the telephone at the probation office. Following the interview, Howard went about his business with the probation officer, and later surrendered at the jail for violation of his probation. The district court specifically found that up until the time Howard surrendered at the jail:

> he had the right and opportunity and knowledge and free-
> dom to leave; that he was free to accompany or not accom-

4

pany the DEA agents upon their initial contact with him;
that his questioning and response to examination and brief-
ing and debriefing was voluntary, that it was noncustodial,
that it was noncoercive, that he was not under any duress.
He was not under any threat or intimidation at the time, no
weapons were brandished. He was never put in custody; he
was never handcuffed or otherwise restrained and that he
had the ability to not make any statements and the right to
leave had he chosen to do so.

Howard contends, however, that two factors militate in favor of
custody in his case. One, the interview with police took place in the
office of his probation officer. Two, the sole purpose of the interview
was for the police to learn about Howard's drug activities. The
Supreme Court has made clear, however, that neither the location nor
the purpose of the interview is dispositive of whether a suspect is in
custody. The fact that the questioning takes place at a police station
is not by itself enough to establish custody so long as the individual
being interviewed would perceive that his freedom of movement was
not constrained to a degree associated with arrest. California v.
Beheler, 463 U.S. 1121, 1125 (1983). The Court has further held that
even a clear statement by an officer that the person being questioned
is a suspect does not alone determine custody, but is only "one among
many factors" that bear on an assessment of whether a reasonable per-
son would feel free to depart. Stansbury v. California, 511 U.S. 318,
325 (1994). The Court has held, in fact, that Miranda warnings are
not required when a suspect voluntarily accompanies police to the sta-
tion, answers questions, and then is allowed to leave. Oregon v.
Mathiason, 429 U.S. 492, 495 (1977). The district court did not err
in determining that Miranda warnings were similarly not required in
this case.

B.

Howard next argues that the trial court erred in disqualifying How-
ard's counsel based on a conflict of interest. During the pretrial hear-
ing on the motion to suppress, Agent Waddell stated that Howard had
admitted that he was part of a drug trafficking organization and that
he would cooperate with authorities except for the fact that his attor-
ney, Louis Vernell, would tell other members of the conspiracy for

5

whom Vernell was also working. Following this hearing, the court ruled that Howard's statements to Waddell were admissible, then <u>sua sponte</u> raised the issue of whether Vernell could continue to represent Howard in the trial.

The court expressed concern over Vernell's representation on two grounds. Initially, the court was troubled that Vernell was representing defendants who were Howard's superiors in the alleged drug organization and whose interests appeared to conflict with Howard's. In addition, the court noted that should Howard's statement concerning his attorney be introduced at trial, either Vernell or Howard would have to testify in order to rebut Agent Waddell's testimony. A lawyer is prohibited, of course, from being a witness while serving in a representative capacity at trial. In order to preserve Howard's Fifth Amendment right to remain silent, the court concluded that Vernell would have to be disqualified so that Vernell would be available to testify on Howard's behalf.

Howard contends that by disqualifying Vernell, the court deprived him of his Sixth Amendment right to counsel of choice. Howard denies that he made the statement to Agent Waddell about his attorney, and he maintains that he was satisfied with Vernell's representation. Furthermore, he argues that the court should have foreseen that the conflict would never arise because any statement Howard may have made about his attorney was not relevant to any fact at issue at trial.

Howard is correct in identifying a right to be represented by an attorney of his own choosing, but that right is not absolute. <u>See Wheat v. United States</u>, 486 U.S. 153, 163 (1988). The right is circumscribed by, among other things, the obligation of trial courts to safeguard the integrity of the proceedings before them. Trial judges may on occasion be required to decline a defendant's offer to waive his own attorney's conflict of interest and indeed district courts "must be allowed substantial latitude" in rejecting waivers of this sort. <u>Id.</u> This circuit has insisted that a trial court "must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal" if it disqualifies a defendant's chosen lawyer. <u>United States v. Williams</u>, 81 F.3d 1321, 1324 (4th Cir. 1996).

6

We hold that the district court did not abuse its discretion in disqualifying Vernell as Howard's counsel. A district court has an obligation to foresee problems over representation that might arise at trial and head them off beforehand. Here, the court had already heard evidence regarding Howard's statement about his attorney and had ruled that statement admissible at trial. The court's concern about Vernell's representation of Howard's superiors in the alleged drug organization, as well as its concern about the potential need for Vernell to testify on Howard's behalf, were well-founded. The district court thus acted within its discretion in ensuring that the vigor of Howard's defense would not be compromised by the competing allegiances of his attorney or an inability to rebut important adverse evidence, which in Howard's case essentially conceded his role in the Raleigh drug conspiracy. We find no basis to overturn the court's disqualification ruling.

III. Trial Issues

A.

The defendants contend that they were deprived of a fair hearing by the prejudicial comments and actions of the trial judge during defense counsel's opening and closing arguments. During the opening arguments, after an objection by the government, the court questioned Jones' counsel as to the "point" of his statements, criticizing him for getting "a little far afield." This, say the defendants, amounted to an expression of disapproval by the judge, and tainted the jurors' perception of the case. Furthermore, the defendants argue, the court was not paying attention during closing arguments, as evidenced by the fact that it asked defense counsel to repeat a statement before the court could rule on a government objection. The defendants contend that this alleged nonchalance signaled to the jurors that the defense argument was not of sufficient importance to hear.

These assignments of error go right to the heart of a trial judge's ability to conduct a trial. A trial judge is charged with ensuring that irrelevant and improper evidence is excluded, and that the trial proceeds in a fair and orderly way. See Fed.R.Evid. 611(a), 614(b); United States v. Castner, 50 F.3d 1267, 1272 (4th Cir. 1995). Reviewing the trial court's conduct for an abuse of discretion, United States

7

<u>v. Seeright</u>, 978 F.2d 842, 847 (4th Cir. 1992), we find none. The court did not err in seeking to ensure that information presented by counsel in an opening statement was neither misleading nor diversionary. Likewise, we find nothing remarkable in the fact that the trial court requested that defense counsel repeat a statement during closing argument after an objection had been made. A trial judge is entitled to make certain that he understands a particular statement before ruling on its propriety.

B.

Howard next objects to the admission of the statement of a co-conspirator, Larry Davis. Another co-conspirator, Tracy Floyd, testified that while in jail he had conversations with his nephew, Larry Davis, relating to, among other things, Howard's role in the conspiracy. Floyd's testimony as to Davis' statements was admitted under the Fed.R.Evid. 801(d)(2)(E) exception to the hearsay rule, which allows for the admission of statements made by co-conspirators during the course and in furtherance of the conspiracy. The defendants argue that the statements at issue do not satisfy the requirements of 801(d)(2)(E) because both Floyd and Davis were incarcerated at the time the statements were made.

We decline to hold that statements made during incarceration automatically fall outside the scope of Rule 801(d)(2)(E). Unfortunately, a conspiracy's activities do not always end when some of its members go to jail. Here, the record amply supports the district court's ruling that the statements were made during the course of the conspiracy. Floyd and Davis were not engaged in "idle chatter" about an unrelated topic, <u>see United States v. Urbanik</u>, 801 F.2d 692, 697-98 (4th Cir. 1986), but rather were discussing where certain drugs were being obtained and who was making money. Floyd was seeking information about drug transactions, in part because he felt that some members of the conspiracy were endangering his family. The avid interest that the conversants were taking in the continued mechanics and operations of the conspiracy is apparent from the transcript. Floyd testified that:

> [Davis] [t]old me that Mu [Howard] is the person who Poochie was going out to some motel past Crabtree Mall to pick the drugs up and deliver to him. . . . . And then[Davis] said

8

eventually it came to the point where when he called he can get it right away, so that's how we got into the conversation of Mu, because at the particular time, you know, I wanted to know what's going on . . . . And so, you know, I'm pressing everybody to find out, well, you know, how is this coming about.

These conversations plainly dealt with what was currently transpiring in the conspiracy. We find no error in the district court's admission of Davis' statements through Floyd's testimony under Rule 801(d)(2)(E). See Bourjaily v. United States, 483 U.S. 171, 175-81 (1987).

C.

Howard and Bacon also contend that the district court erred in failing to instruct the jury on multiple as well as single conspiracies. Howard argues that he presented sufficient evidence to show that a 1989 conviction he had for felony possession of cocaine was unconnected to the people or events of the 1993-95 conspiracy.

Assuming that Howard's 1989 conviction was unconnected to the later activities, the district court's failure to give a multiple conspiracy instruction in this case was at most harmless error. This court has explained that failure to give a multiple conspiracy instruction is not reversible error "unless the defendants demonstrate that they have been prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial." United States v. Kennedy, 32 F.3d 876, 884 n.1 (4th Cir. 1994) (internal quotations omitted); accord United States v. Curry, 977 F.2d 1042 (7th Cir. 1992). Howard and Bacon could demonstrate prejudice only if they could show that they "were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." Kennedy, 32 F.3d at 884 (internal quotations omitted). This they cannot do. As discussed in the following section, the government marshaled significant evidence to prove Howard and Bacon's connection with the actors and activities in the overall conspiracy charged. Howard and Bacon thus suffered no prejudice from the lack of instruction on multiple conspiracies.

9

D.

Howard and Bacon next argue that the government did not introduce sufficient evidence to support their conspiracy convictions. They contend that the evidence established only general allegations of the sale of drugs, not that Howard and Bacon had any knowledge of a conspiracy or became members of it. See United States v. Chambers, 985 F.2d 1263, 1270 (4th Cir. 1993).

We find the sufficiency contentions quite remarkable given the evidence introduced against the defendants at trial. Larry Davis testified that he recruited Bacon and co-conspirator Jones, childhood friends from Florida, to come to North Carolina to sell drugs for him. Davis further testified that Bacon and Jones were given guns to protect themselves during the sale of drugs, and that they kept approximately $600 to $700 per day as their take from sales. Troy Davis testified that he was the middleman for one of the houses where Bacon sold drugs. He also stated that Bacon processed and sold crack cocaine. Tracy Floyd testified that Bacon was a "worker" for Larry Davis in the drug business. The government presented guns and drugs found at an address where Jones was arrested and where government witnesses testified Jones and Bacon had sold drugs. Raleigh Police Detective Moss testified that Bacon told him he was selling crack cocaine in Raleigh.

As to the evidence against Howard, Larry Davis testified that he heard the name "MU" or "MU Melvin" from co-conspirator Tracy Floyd and also from another drug dealer, "Poochie." (Howard's full name is Melvin Eugene Howard.) Davis said that during the operation of the conspiracy, he would give money to Poochie, who would call "MU" and go meet him at the local Wal-Mart to buy drugs. Tracy Floyd testified that an individual named Rod told him to take money to "MU," and that Floyd had delivered between $4,000 and $6,000 to a man he identified as defendant Howard. Christopher Davis testified that he had received multi-ounce quantities of crack cocaine from Howard on several occasions, including one on which he was arrested by Raleigh police while carrying 80 grams of crack. Samuel Cheatham, a co-conspirator, testified that Poochie had put him in touch with Howard to get drugs. Cheatham subsequently purchased 4.5 ounces of crack from Howard for $3,500.

10

The jury verdicts against Bacon and Howard are thus amply supported by the evidence in this case.

IV. <u>Sentencing Issue</u>

Finally, Jones contends that the trial court improperly relied on a North Carolina drug conviction to enhance his sentence. Jones' sentence was enhanced to mandatory life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A), which states in part,"If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment . . . ." Jones was arrested for this conspiracy charge February 28, 1995. A month before, on January 23, 1995, Jones was convicted in North Carolina of committing a drug felony. Jones argues that the North Carolina conviction cannot provide the basis for enhancement under section 841(b)(1)(A) because: (1) the January 23 conviction occurred after the commencement of the conspiracy charged in this case, and (2) the January 23 conviction was not yet final at the time he was arrested for this conspiracy.

We disagree. The statute itself contains no definition of the terms "prior" and "final" convictions. Although this circuit has not yet had occasion to address the question of whether convictions during the course of a conspiracy can form the basis for a sentencing enhancement under section 841, we find the reasoning of the Eleventh Circuit in <u>United States v. Hansley</u>, 54 F.3d 709 (11th Cir. 1995), persuasive. The <u>Hansley</u> court held that because the"purpose of the mandatory minimum enhancement is to target recidivism, it is more appropriate to focus on the degree of criminal activity that occurs after the defendant's conviction for drug-related activity is final rather than when the conspiracy began." <u>Id.</u> at 717 (internal quotation omitted). In Jones' case, the government presented ample evidence of Jones' continued involvement in the conspiracy <u>after</u> his North Carolina conviction. Jones was arrested on February 28, 1995 at 1107-B State Street in Raleigh. Witness Larry Davis testified that he rented this apartment to provide Bacon, Jones, and others a place from which to sell drugs. The arresting officers found 46 grams of cocaine base and two guns in the apartment at the time of the arrest. The only thing that aborted Jones' participation in the drug conspiracy was his arrest in this case.

11

Jones' continued participation in the conspiracy after his North Carolina drug conviction is precisely the type of recidivism to which section 841 is addressed.

Jones next argues that his North Carolina conviction cannot support a section 841 enhancement because it was not"final" within the meaning of the federal statute. He concedes that he had not filed an appeal within the ten-day time limit set forth in Rule 4 of the North Carolina Rules of Appellate Procedure. He argues, however, that his conviction was still not final because Rule 21 of the North Carolina Rules of Appellate Procedure affords him the opportunity to file a special petition for certiorari "without unreasonable delay," even if he misses the ten-day appeal deadline.

Again, we find Jones' assertion unpersuasive. The finality of a conviction is a matter of federal rather than state law. United States v. Campbell, 980 F.2d 245, 250 n.6 (4th Cir. 1992). This court held in Campbell that a prior conviction is final for the purposes of a section 841 enhancement when the time for taking a direct appeal has expired. Id. at 250-51. Jones had not filed an appeal within the required time, and he cannot rely on Rule 21 to forestall indefinitely the finality of his conviction when he had shown no intention of taking advantage of the special petition for certiorari.

V.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED